FILED

03/28/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 16-0008

DA 16-0008

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 69

IN THE MATTER OF:

C.K.,

         Respondent and Appellant.

APPEAL FROM:   District Court of the First Judicial District,
In and For the County of Lewis And Clark, Cause No. CDI 15-73
Honorable Kathy Seeley, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

           Chad Wright, Chief Appellate Defender, Helena, Montana

       For Appellee:

           Timothy C. Fox, Montana Attorney General, Madison L. Mattioli,
Assistant Attorney General, Helena, Montana

           Leo John Gallagher, Lewis and Clark County Attorney, Luke
Berger, Deputy County Attorney, Helena, Montana

Submitted on Briefs:  February 8, 2017

Decided:  March 28, 2017

Filed:

_____
Clerk

Justice Dirk M. Sandefur delivered the Opinion of the Court.

¶1    C.K. appeals from an order of the Montana First Judicial District Court committing him to the Montana State Hospital (MSH) for involuntary mental health treatment pursuant to § 53-21-127, MCA. C.K. asserts that the District Court erroneously admitted and considered inadmissible hearsay referenced in the expert testimony of the examining mental health professional, Kim Waples. C.K. timely appealed. We affirm, addressing the following issue:

*Did the District Court abuse its discretion in admitting and considering hearsay statements referenced in the examining professional's hearing testimony?*

**BACKGROUND**

¶2    C.K. was previously diagnosed with schizoaffective disorder, bipolar type. Prior to the circumstances that led to the State's most recent petition, C.K. was taking prescribed medication and participating in the Program for Assertive Community Treatment (PACT), a treatment and support program for persons suffering from serious and disabling mental illnesses. At some point, C.K. quit PACT and stopped taking his prescribed medication.

¶3    Three witnesses testified at C.K.'s commitment hearing: his father, Sgt. Jeff Wilson of the Helena Police Department, and Waples. According to his father, C.K. slipped into a familiar pattern of aggressive and unsociable behavior when he quit PACT and stopped taking his medication. The weekend before the commitment hearing, C.K. woke his parents in the early hours of the morning while searching for his cellphone. C.K. thought he heard it ringing, but could not find it. He was so agitated that his mother

2

felt it necessary to get out her pepper spray for protection. Worried that C.K. posed a danger to himself and others, his father took him to St. Peter's Hospital for an evaluation under his medical power of attorney.

¶4 C.K. was uncooperative and disruptive at the hospital. The St. Peters staff requested assistance from the Helena Police Department. Upon arrival, Sgt. Wilson and two other officers found C.K. in the E.R. waiting room talking nonsensically in the company of his parents and hospital staff. Sgt. Wilson knew C.K. from prior interactions and later testified that his behavior that night was out of character. Due to C.K.'s aggressive behavior and desire to leave the E.R., Sgt. Wilson was preparing to place him in protective custody until an E.R. doctor eventually convinced him to stay. As the officers escorted C.K. to an E.R. room, he asked Sgt. Wilson if his gun was loaded and also asked one of the other officers to give C.K. his gun.

¶5 Sgt. Wilson testified that C.K. acted aggressively toward the officers over the next four to five hours, staring them down and making lunging movements toward them. At one point while staring down an officer, C.K. spit into the palm of his hand and threateningly punched his other fist into the palm. Sgt. Wilson was present outside C.K.'s room until he was transferred to the Hays-Morris House, a therapeutic group home in Butte. As the officers prepared C.K. for transfer, Sgt. Wilson observed him raise his arm in a threatening manner towards one of the other officers.

¶6 Waples had previously worked with C.K. and was involved in his prior involuntary commitments. Upon notification from the hospital staff, she responded to the E.R. to evaluate him. Waples testified that he appeared agitated, paced around the room,

3

and occasionally tried to leave until thwarted by the officers. Waples observed C.K.'s aggressive conduct toward the officers at the E.R. After answering a few questions, C.K. became uncooperative with Waples and refused to speak to her further. Waples ultimately arranged for C.K.'s transfer to the Hays-Morris therapeutic group home.

¶7 Pursuant to §§ 53-21-123 and -126(3), MCA, Waples prepared a preliminary mental health evaluation report for attachment to the State's initial involuntary commitment petition. The report summarized the night's events based on her own observations and information related to her by C.K.'s father, Sgt. Wilson, and an attending E.R. doctor. The report also included a verbatim passage from another mental health professional's prior report detailing C.K.'s mental health history.

¶8 At the commitment hearing, Waples testified about C.K.'s behavior based on her initial evaluation report and Hays-Morris House counseling and staff records. Over objection, Waples testified that C.K.'s irritable and threatening behavior continued after transfer to the Hays-Morris House. Waples specifically testified that C.K. had threatened to kill people and would violently bang on a protective plexiglass window so hard that the Hays-Morris staff were worried it might break. C.K. acknowledged that Waples could properly rely on the Hays-Morris records as a basis for her expert opinion but asserted that she could not properly reference or repeat the actual substance of the otherwise inadmissible hearsay. The District Court overruled the objection and allowed Waples to reference the substance of the third-party accounts of C.K.'s behavior as one of the bases for her opinion testimony. Based on C.K.'s diagnosed mental disorder, her personal observations of his behavior, the Hays-Morris records, and other third-party

4

accounts referenced in her evaluation report, Waples recommended that the Court commit C.K. to the MSH for involuntary treatment.

¶9 At the close of the hearing, based on the testimony of Waples, C.K.'s father, and Sgt. Wilson, the District Court granted the State's petition and committed C.K. to the MSH for 90 days pursuant to § 53-21-127, MCA. In its findings of fact, the District Court generally referenced the personal observations of each witness as well as Waples' professional opinions and commitment recommendation. C.K. timely appealed, asserting that the District Court erroneously admitted and considered inadmissible hearsay referenced in Waples' hearing testimony.

## STANDARDS OF REVIEW

¶10 In an involuntary mental health commitment proceeding, the standard of review is whether the district court's "findings of fact are clearly erroneous and its conclusions of law are correct." *In re Mental Health of L.K.-S.*, 2011 MT 21, ¶ 14, 359 Mont. 191, 247 P.3d 1100 (citing *In re T.S.D.*, 2005 MT 35, ¶ 13, 326 Mont. 82, 107 P.3d 481). A finding of fact is clearly erroneous only if not supported by substantial credible evidence, the district court misapprehended the effect of the evidence, or we have a definite and firm conviction upon review of the record that the court otherwise erred. *L.K.-S.*, ¶ 14.

## DISCUSSION

¶11 *Did the District Court abuse its discretion in admitting and considering hearsay statements referenced in the examining professional's hearing testimony?*

¶12 Involuntary mental health commitment proceedings are civil matters that implicate fundamental liberty interests in a manner similar to criminal proceedings. *In re Mental*

5

*Health of T.J.D.*, 2002 MT 24, ¶ 20, 308 Mont. 222, 41 P.3d 323. To safeguard against the "calamitous effect" of an erroneous deprivation of liberty and damage to a person's reputation, courts must strictly adhere to the statutory standards of proof, procedural requirements, and substantive criteria specified by §§ 53-21-126 and -127, MCA. *In re B.D.*, 2015 MT 339, ¶ 7, 381 Mont. 505, 362 P.3d 636.

¶13　Upon the State's filing of an involuntary commitment petition, the respondent must undergo a professional mental health evaluation. Section 53-21-123, MCA. The examining professional must submit a written evaluation report to the court for a preliminary determination of whether cause exists to proceed further. *See* § 53-21-123(1), MCA. If the proceedings continue, the examining professional must also attend the commitment hearing and be subject to cross-examination by the respondent. Section 53-21-126(3), MCA.

¶14　At the commitment hearing, the State must prove that the respondent both suffers from a mental disorder and requires commitment on one of the following grounds:

(1)　due to the mental disorder, the respondent is substantially unable to provide for his or her own basic needs of food, clothing, shelter, health, or safety;

(2)　due to the mental disorder, the respondent has recently, through an act or an omission, caused injury to self or others;

(3)　due to the mental disorder, the respondent's acts or omissions have caused an imminent threat of injury to self or others; or

(4)　whether the respondent's mental disorder, as demonstrated by his or her recent acts or omissions, will, if untreated, predictably result in deterioration of his or her mental condition to the point that the respondent

6

will either become a danger to self or to others or will be unable to provide for his or her own basic needs of food, clothing, shelter, health, or safety.[1]

Section 53-21-126(1), (4), MCA. A diagnosed mental disorder is insufficient alone to warrant an involuntary commitment. Section 53-21-126(4), MCA. Involuntary commitment is permissible only on sufficient proof of a mental disorder *and* additional "evidence from the professional person or others" proving one the specified statutory commitment criteria. Section 53-21-126(4), MCA.

¶15 Different burdens of proof apply in involuntary commitment hearings. The State must prove the existence and nature of the respondent's mental disorder to a reasonable medical certainty and all pertinent physical facts beyond a reasonable doubt. Section 53-21-126(2), MCA. The State must prove all other matters by clear and convincing evidence. Section 53-21-126(2), MCA.

¶16 C.K. asserts that the District Court erroneously admitted and considered Waples' testimony referencing inadmissible hearsay from her initial evaluation report and therapeutic group home records. The State may attach the examining professional's preliminary evaluation report to its initial petition, but any otherwise inadmissible matter, such as hearsay, "is not admissible merely because it is contained in the report." Section 53-21-126(3), MCA. The report and its substantive contents are admissible only as otherwise permissible under the applicable rules of evidence. *See* §§ 53-21-

---

[1] The State may prove predictability based on the respondent's relevant medical history. Section 53-21-126(1)(d), MCA.

115(7), -126(3), MCA; M. R. Evid. 101(a) (M. R. Evid. generally govern all state court proceedings).

¶17 By definition, hearsay "is a statement, other than one made by the declarant while testifying" in a judicial proceeding and is offered "*to prove the truth of the matter asserted.*" M. R. Evid. 801(c) (emphasis added). Hearsay is generally inadmissible "except as otherwise provided by statute" or the Rules of Evidence. M. R. Evid. 802. Thus, if offered as substantive proof of the truth of the matters asserted therein, Waples' hearing testimony referencing or repeating out of court statements from other sources was inadmissible hearsay.

¶18 However, evidence inadmissible for one purpose may be admissible for another. M. R. Evid. 105. Qualified expert testimony is admissible if scientific, technical, or other specialized knowledge will assist the trier of fact in determining a fact at issue in the case. M. R. Evid. 702. If the information is "of a type reasonably relied upon by experts in" the subject field, an expert may base his or her opinion or inference on otherwise inadmissible evidence or facts not in evidence. M. R. Evid. 703. Rule 703 thus contemplates that a testifying expert may refer to otherwise inadmissible hearsay upon a foundational showing that the expert relied on the otherwise inadmissible evidence in forming the expert's opinion and the information is of a type reasonably relied upon by experts in the field of expertise. *Weber v. BNSF Ry. Co.*, 2011 MT 223, ¶¶ 38-39, 362 Mont. 53, 261 P.3d 984 (affirming exclusion of Rule 703 evidence pursuant to order in limine based on Rules 702, 402, and 403 foundational reliability and probative value deficiencies); *Tripp v. Jeld-Wen*, 2005 MT 121, ¶¶ 15-18, 327 Mont. 146, 112 P.3d 1018

8

(affirming exclusion of Rule 703 evidence pursuant to Rule 403); *Mason v. Ditzel*, 255 Mont. 364, 373-74, 842 P.2d 707, 713 (1992) (affirming medical expert's reading of third-party medical records pursuant to Rule 703 independent of Rule 803 hearsay exceptions); *Diacon ex rel. Palmer v. Farmers Ins. Exchange*, 233 Mont. 515, 520-21, 761 P.2d 401, 405 (1988) (affirming physician medical expert's reading of third-party medical records pursuant to Rule 703 independent of Rule 803 hearsay exceptions); *State Highway Comm'n v. Greenfield*, 145 Mont. 164, 167-70, 399 P.2d 989, 990-92 (1965) (affirming admission of real estate appraiser testimony regarding otherwise inadmissible comparable sales information); *see also Reese v. Stanton*, 2015 MT 293, ¶¶ 22-24, 381 Mont. 241, 358 P.3d 208 (affirming expert reference to underlying hearsay as basis of opinion under Rule 705).[2]

¶19 Rule 703 ultimately favors admission of otherwise inadmissible hearsay upon careful Rule 403 balancing to safeguard against the danger of unfair prejudice or needless presentation of cumulative evidence. By application of Rule 801(c), Rule 703 circumvents the general prohibition of Rule 802 by repurposing otherwise inadmissible hearsay as definitional non-hearsay. Under this view, because its limited purpose is "only to show the basis of the testifying expert's opinion" rather than as substantive proof of the facts asserted therein, the otherwise inadmissible hearsay is definitional non-

---

[2] Under pre-2000-amendment Fed. R. Evid. 703, see similarly *Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 728 (6th Cir. 1994); *United States v. Elkins*, 885 F.2d 775, 786 (11th Cir. 1989); and see generally *United States v. Sowards*, 339 F.2d 401, 402 (10th Cir. 1964). M. R. Evid. 703 "is identical to" pre-2000-amendment Fed. R. Evid. 703. Commission Comments, M. R. Evid. 703.

hearsay and thus not subject to Rule 802 exclusion. *See State v. Smith*, 159 P.3d 531, 538 (Ariz. 2007); M. R. Evid. 801(c) (hearsay definition).

¶20 Alternatively, Rule 703 is also amenable to construction as an implicit exception to the hearsay rule. This view recognizes that the otherwise inadmissible hearsay cannot serve its limited Rule 703 purpose of aiding assessment of the credibility and reliability of the expert's opinion unless the finder of fact takes it as true. *See* David H. Kaye, et al., *The New Wigmore: A Treatise on Evidence* § 4.10.1 (2d ed. 2011) [hereinafter Kaye, *The New Wigmore*]. Thus, regardless of its stated purpose, the otherwise inadmissible information remains definitional hearsay precluded by Rules 801(c) and 802. Therefore, Rule 703 is, in effect, an implicit exception to the hearsay rule.[3] *See* Kaye, *The New Wigmore*, § 4.7.2.

¶21 Under either view, the sole purpose of admission of otherwise inadmissible hearsay under Rule 703 is to aid the finder of fact in assessing the credibility and reliability of the expert's opinion. Otherwise inadmissible hearsay admitted under Rule 703 is not substantive evidence of the matter asserted therein. *See* M. R. Evid. 105, 703, 801(c), and 802. Thus, Rule 703 does not allow an expert to serve as a conduit to admit otherwise inadmissible information as substantive evidence. *Weber*, ¶ 38 (expert may not simply transmit inadmissible hearsay); *Reese*, ¶¶ 22-24 (citing *Weber*, ¶¶ 38-39); *see*

---

[3] *See* M. R. Evid. 802 (hearsay "not admissible except as otherwise provided by . . . these rules"). As an alternative to an implied standalone exception, this Rule 703 construction could also be viewed as a residual exception under Rules 803(24) and 804(b)(5) where the requisite circumstantial guarantee of trustworthiness is Rule 703's foundational reliability requirement, *i.e.*, that the information is of a type relied upon by experts in the field.

10

*also*, *e.g.*, *United States v. Kantengwa*, 781 F.3d 545, 561 (1st Cir. 2015) (applying Fed. R. Evid. 703); *James v. Ruiz*, 111 A.3d 123, 135 (N.J. Super. Ct. App. Div. 2015) (applying N.J. R. Evid. 703); *State v. Lundstrom*, 776 P.2d 1067, 1074 (Ariz. 1989) (applying Ariz. R. Evid. 703).

¶22 Rule 403 is the critical safeguard that strikes the balance between proper admission of otherwise inadmissible hearsay under Rule 703 and the prejudicial admission of inadmissible hearsay as substantive proof contrary to Rule 802. *See*, *e.g.*, *Tripp*, ¶¶ 15-17 (Rule 703 is subject to Rule 403). The trial court has broad discretion to exclude otherwise relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by . . . needless presentation of cumulative evidence." M. R. Evid. 403. Rule 403 affords the court broad discretion to limit or preclude admission of otherwise inadmissible hearsay under Rule 703 where necessary to avoid needless presentation of cumulative evidence or the danger that the factfinder will prejudicially view the Rule 703 information as substantive proof not subject to the usual safeguards of foundational competence and cross-examination. *See Weber*, ¶ 39 (precluding physician from testifying to result of questionable PET scan performed by another); *Reese*, ¶ 24 (affirming expert reading from third-party report but precluding admission of report itself); *Tripp*, ¶¶ 15-17 (precluding flooring expert from referring to third-party accounts of similar floor defects); *State v. Van Dyken*, 242 Mont. 415, 428-29, 791 P.2d 1350, 1358-59 (1990) (precluding defense mental health expert from repeating homicide defendant's version of events in support of

expert's opinion that defendant was incapable of forming requisite criminal intent).[4] Thus, subject to limitation or exclusion under Rule 403, otherwise inadmissible hearsay may be admissible through an expert under Rule 703 upon proper foundation and for the limited purpose of explaining the basis of the expert's opinion rather than as substantive proof of the facts asserted in the statement.

¶23    Citing *State v. Bailey*, 2004 MT 87, ¶ 27, 320 Mont. 501, 87 P.3d 1032, and *Perdue v. Gagnon Farms, Inc.*, 2003 MT 47, ¶ 34, 314 Mont. 303, 65 P.3d 570, C.K. asserts that, while it allows an expert to rely on otherwise inadmissible hearsay, Rule 703 does not allow an expert to reference or repeat the substance of the hearsay statement before the fact-finder.  In *Perdue*, the defendant in a traffic-accident-related wrongful death action called the investigating Montana Highway Patrol officer to present expert accident reconstruction testimony.  *Perdue*, ¶¶ 27-31.  Over the plaintiff's objection, the district court allowed the expert to recount statements made by third-party witnesses to the expert during the course the investigation.  *Perdue*, ¶ 33.  On the ground that the primary purpose was to prove the truth of the matters asserted rather than the more limited purpose authorized by Rule 703, we held that allowing the expert to refer to the third-party statements was reversible error.  *Perdue*, ¶¶ 36-37.

¶24    In *Bailey*, on appeal of two felony incest convictions, the defendant asserted that the district court erroneously allowed a medical doctor to state his opinion that, based on

---

[4] As an additional safeguard, Rule 105 requires the court, upon request, to give an instruction limiting consideration of the otherwise inadmissible hearsay to its Rule 703 purpose rather than as substantive evidence of the facts asserted therein.

his interviews and physical examinations of the victims, both victims had been sexually abused. *Bailey*, ¶ 25. Though the doctor did not reference what the girls said, the defendant asserted that the doctor's testimony effectively amounted to inadmissible hearsay because it allowed the jury to prejudicially infer that the girls told the doctor that the defendant abused them. *Bailey*, ¶ 26. We held that the admission of the doctor's testimony was not error because he did not reference or repeat what the girls said and because Rule 703 expressly allows an expert to base his or her opinion on otherwise inadmissible hearsay. *Bailey*, ¶ 27.

¶25 Without analysis, we categorically stated in *Perdue* and *Bailey* that Rule 703 does not allow an expert to reference or repeat otherwise inadmissible information upon which the expert relied. *Perdue*, ¶ 34 (Rule 703 "does not give a witness permission to repeat inadmissible out-of-court statements to bolster his or her expert opinions before the jury."); *Bailey*, ¶ 27 (expert may rely on inadmissible evidence but may not repeat it to the jury). However, stripped of our categorical statements, *Perdue* and *Bailey* are consistent with our prior and subsequent Rule 703 authority. *Perdue* merely held that the court erroneously admitted the subject hearsay statements under Rule 703 because the defendant presented them as substantive proof of the matters stated rather than for the limited purpose of explaining the basis of the expert's opinion. *See Perdue*, ¶¶ 36-37. *Bailey* merely held that the doctor properly relied in part on inadmissible evidence pursuant to Rule 703 without prejudicially disclosing its substance to the jury. *See Bailey*, ¶ 27. Because they are unnecessarily broader than our ultimate holdings in those cases and inconsistent with our prior and subsequent Rule 703 authority, we hereby

clarify and limit our categorical statements in *Perdue*, ¶ 34, and *Bailey*, ¶ 27, in accordance with the ultimate holdings in those cases and our analysis here. As clarified, *Perdue* and *Bailey* are distinguishable here.

¶26 C.K. does not dispute that Waples was qualified to give expert testimony. C.K. is correct to the extent that he asserts that Waples' testimony referring to the substance of statements attributed to others would have been inadmissible under Rules 802 and 801(c) if the sole purpose was to prove the truth of those statements. However, in overruling C.K.'s objection, the District Court clearly recognized the limited permissible purpose for admission of the otherwise inadmissible hearsay, to wit: "I'm going to let her tell me what is in the record. That's what she relied on as part of her reaching her opinion about this case." Thus, in context, Waples referenced the otherwise inadmissible hearsay as part of the stated basis for her professional opinion that C.K. suffered from a mental disorder and, as a result, presented an imminent risk of harm to himself or others.

¶27 We faced a similar situation in *In re J.M.*, 217 Mont. 300, 704 P.2d 1037 (1985). In *J.M.*, the examining professional in an involuntary mental health commitment proceeding had limited personal knowledge of the respondent due to the respondent's lack of cooperation during the examination. *J.M.*, 217 Mont. at 305, 704 P.2d at 1040. Based on his limited personal knowledge and consideration of information from other sources, the examining professional testified at the commitment hearing that the respondent "represented a threat of imminent injury to others" due to his mental disorder, "poor judgment, . . . poor impulse control, . . . his intense and unpredictable feelings," and "his threats toward others." *J.M.*, 217 Mont. at 303-07, 704 P.2d at 1039-42. In

14

rejecting the respondent's assertion that the district court erroneously based its findings on inadmissible hearsay referenced by the examining professional, we held that the examining professional in an involuntary commitment proceeding may:

> express his opinion as to the serious mental illness of a party *even though the evidence of such things as imminent threat of injury are made know* [sic] *by hearsay evidence and not based upon the professional person's personal knowledge*. There is no requirement that the facts upon which an expert relies in forming an opinion be in themselves admissible in evidence. Rule 703, Mont.R.Evid.

*J.M.*, 217 Mont. at 305, 704 P.2d at 1041 (citations omitted and emphasis added).

¶28 Here, as in *J.M.*, the District Court's ultimate findings of fact under § 53-21-126(1) and (4), MCA, are supported by substantial credible evidence based on the non-hearsay testimony of C.K.'s father, Sgt. Wilson, and the examining professional, Waples. As in *J.M.*, Waples based her opinion testimony on her professional expertise, her own personal observations, and otherwise inadmissible hearsay of a type reasonably relied upon by mental health experts. C.K. has made no showing, and we find no basis on the record to independently conclude, that any risk of prejudice posed by admission and consideration of the otherwise inadmissible hearsay referenced by Waples substantially outweighed its probative value under Rule 703. We conclude the District Court did not abuse its discretion in admitting and considering Waples' testimony.

## CONCLUSION

¶29 We hold that, subject to limitation or exclusion under Rule 403, otherwise inadmissible hearsay may be admissible through an expert under Rule 703 upon proper foundation and for the limited purpose of explaining the basis of the expert's opinion

rather than proving the facts asserted in the statement. The District Court did not abuse its discretion in admitting and considering otherwise inadmissible hearsay referenced in Waples' testimony for the purpose of explaining her opinions and recommendations. We affirm.

/S/ DIRK M. SANDEFUR

We concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ MICHAEL E WHEAT
/S/ JIM RICE